**Billy C. STILL, Petitioner,**

v.

**C. J. FITZHARRIS, Superintendent, Correctional Training Facility, Respondent.**

**No. C–69 238.**

United States District Court,
N. D. California.

Aug. 31, 1970.

Heller, Ehrman, White & McAuliffe, by Leonard M. Patterson, Jr., San Francisco, Cal., for petitioner.

Thomas C. Lynch, Atty. Gen., of California, by Karl S. Mayer, Deputy Atty. Gen., San Francisco, Cal., for respondent.

### MEMORANDUM OPINION AND ORDER

GEORGE B. HARRIS, Chief Judge.

Petitioner and his co-defendant were convicted of murder and robbery on May

14, 1964. Petitioner was sentenced to life imprisonment, and his co-defendant was sentenced to death. Petitioner did not appeal his conviction, and alleges here that inadequate representation of counsel resulted in denial of his right to appeal.

Petitioner has twice previously sought relief in the California courts. Both applications were denied.

An earlier petition in this Court was dismissed on February 14, 1968. An appeal was taken and the case remanded with instructions to hold the proceedings in abeyance until the California courts could consider anew petitioner's applications for relief. Still v. Fitzharris, 413 F.2d 977 (9th Cir. 1969). The California Court of Appeal reaffirmed its earlier denials. Peo. v. Still, Crim. Nos. 4723 & 5858 (1st App.Dist., Div. 2, August 6, 1969).

An evidentiary hearing was held by this Court to consider petitioner's claim.

From the evidence adduced at the hearing it appears that the petitioner was represented at trial by an experienced trial lawyer who was formerly a Public Defender, and his assistant. The matter of an appeal was discussed by petitioner and his attorney throughout the course of the trial, as well as subsequent to conviction and prior to judgment.

It was counsel's opinion, communicated to petitioner at the meeting, that there was no legal basis for a successful appeal. Petitioner's attorney testified that petitioner appeared satisfied with the outcome, inasmuch as his co-defendant had received the death penalty, and did not request an appeal. The record further discloses that petitioner feared that a retrial might adduce evidence which would prejudice future prospects for parole. (Tr. p. 42)

Petitioner was told by his attorney to consider an appeal in light of all the discussions and to inform counsel if an appeal was desired. He was instructed that a notice of appeal would have to be filed before petitioner was transported from county jail to state prison.

It is the rule in this Circuit that trial counsel has an affirmative duty to file a notice of appeal, or to tell his client how to proceed " * * * when trial counsel knows that his client wants to appeal, knows that his client is indigent, knows that his client is not represented by appellate counsel, and knows that his client is ignorant of the availability of an indigent appeal and of the procedure for instituting such an appeal * * *." Gairson v. Cupp, 415 F.2d 352, 353 (9th Cir. 1969). Petitioner was more than adequately represented when the conduct of counsel is measured against the standard enunciated in Gairson.

An appeal was discussed extensively. Petitioner was informed of counsel's opinion that no grounds existed for a successful appeal, and petitioner appeared satisfied with the result. He did not communicate to his attorney any desire to appeal though told to do so if he wanted to appeal. There is no evidence to indicate that petitioner was prevented from communicating with his attorney.

The evidentiary hearing conducted by this Court was replete with inferences to the care with which petitioner's case was handled by able, appointed trial counsel. It is quite apparent from any fair analysis of the testimony that the petitioner simply did not desire to prosecute an appeal, after having been thoroughly informed as to his rights and after several complete discussions with appointed counsel. (See *Appendix*)

The standard as enunciated in Gairson v. Cupp, supra, p. 353, was met in all particulars and there is no merit to petitioner's claims.

Accordingly, the petition for writ of habeas corpus is denied.

## APPENDIX

MR. MAYER: Q. Mr. Pestarino, did you ever advise Mr. Still that he didn't have a right to appeal?

A. Oh, certainly not.

Q. Did you ever advise him that he couldn't get free counsel on appeal?

A. No, sir. (Tr. p. 10, ll. 15-21)

THE COURT: Had you prepared or collated from the record any specification of possible error that occurred during the trial?

MR. PESTARINO: A. Yes, Your Honor. We were very careful on the trial. We had a daily transcript and as I recall we went over it daily to discuss the rulings and admissibility of evidence and so forth, and further we discussed those. (Tr. p. 11, ll. 13–20)

MR. MAYER: Mr. Pestarino, did Mr. Still ever say he wanted to appeal?

THE WITNESS: No. sir.

MR. MAYER: That is all. (P. 12, ll. 12–15)

MR. MAYER: Q. Do you recall whether in discussing an appeal with Mr. Still you indicated to him that his notice of appeal would have to be promptly filed or within a specified time?

MISS DAYS: A. I don't recall stating any specified time but I do recall I indicated if he wanted to appeal he should contact Mr. Pestarino or me and suggested that he make that contact in Santa Clara County. (P. 38, ll. 9–15)

MR. MAYER: Q. Did you ever advise or indicate to Mr. Still in any way that if the appeal—well, if he got life imprisonment and appealed, by so doing he would be exposed to the death penalty on a retrial?

MISS DAYS: A. No. In fact when we discussed the possibility of an appeal in the event he was sentenced to life the things we were discussing with him would there be any grounds for an appeal and number two, would those grounds be cause for reversal.

Then number three, would it make any change in the outcome of the trial. Essentially our conversation with him was that we didn't feel, in view of the evidence, that there would be any change in an outcome.

Q. There was no indication that a change in the outcome could result in a worse or more severe penalty?

A. No.

Q. Were there any discussions about whether Mr. Still would have to pay for an appeal or whether an appeal would cost him any money?

A. No, there wasn't any discussion on that line. However, the cause of the change in attorneys—I know, I myself, explained to Mr. Still about the fact that we were court-appointed attorneys and in some jurisdictions they did have a public defender system. In Santa Clara County at that time we did not. I indicated to him that at every stage of the proceeding that the defendant was entitled to counsel and would be provided for the defendant's fee if he didn't have the funds to provide for one for him. (p. 39, ll. 9–25; p. 40, ll. 1–11)

MISS DAYS:

A. I said he should contact either Mr. Pestarino or I and let us know before he left Santa Clara County because it would facilitate the matter in filing the notice since it had to be filed in Santa Clara County. (p. 41, ll. 18–21)

THE COURT: What did he say that would indicate that he would not want to appeal?

THE WITNESS: Well, before the trial he had indicated that he was—once he understood the felony murder doctrine he was concerned about the record indicating that he was not a violent man and I think anyone reading the record would see that essentially that Billy was a good man, a hard-working man who simply, because he got a little bit drunk and got in with the wrong person fell into this trouble.

There were two occasions—one, during the course of the trial and one during the course of the argument after the trial in which the District Attorney did lean a little heavier on the evidence with regard to Billy than he had at some other point and Billy indicated to me during those times that he realized that on a retrial the District Attorney's Office, either with a new attorney or the same attorney taking a different tack could present the evidence against him a lot harder than perhaps they had during

this trial and he seemed fairly satisfied with the way the evidence had been presented, particularly in view of our conversation with regard to what part the record might play in a parole situation.

THE COURT: Did he ever indicate to you any dissatisfaction with your service or you colleague's services?

THE WITNESS: No. In fact I thought he seemed very grateful for the fact that since he had no family in the area and had taken the time to go up and see him as often we did.

THE COURT: Did he express to you at any time a fear in the event of another trial of receiving the extreme penalty?

THE WITNESS: Not that I recall.

THE COURT: You heard his testimony on the stand?

THE WITNESS: Yes, I heard it but I don't recall any such conversations or any such fear brought to my attention, and as I said, in the course of our discussions that we had with him regarding the possibility of an appeal our statements to him were always to the effect that it couldn't come out any worse than it did but that we felt there wouldn't be any change.

MR. PATTERSON: Q. What was your basis for feeling that he was reluctant to appeal if he had already received the partial sentence that he could receive on a retrial?

A. I don't know if it was a reluctance or whether it was the fact that he felt it really wouldn't change the situation except the only reluctance was, as I said, because of these two things that happened: One during the course of the trial and the statement made during the argument by the District Attorney that he felt perhaps there was a possibility that the evidence could be presented against him a little stronger than it had been in the particular trial that was just completed.

Q. Toward the end of your testimony on direct I believe you said that you told Mr. Still that he had a right to counsel at every stage of the proceeding, is that correct?

A. That is correct.

Q. Can you tell the Court what you meant by the proceeding?

A. We were talking about the various stages of the proceedings and one of the difficulties in Billy's case was he made some statements prior to the time he had any counsel and we were discussing his right to have counsel at that time and at that time I was indicating to him—

Q. This is a pretrial matter?

A. Yes, and then we went on through to the fact that he had the right to counsel at all times, pretrial, trial and at every stage.

Q. Did you specifically tell him that he had a right to appeal?

A. I don't recall his asking that.

Q. You don't recall telling him?

A. No, except for the fact that I did tell him that if he wanted to appeal he should contact us and he knew we were court-appointed counsel.

Q. Do you recall telling him that he had a right to an attorney for appeal at public expense?

A. As I say, I don't recall telling him specifically in those words. I simply recall telling him that he had a right to an attorney at every stage of the proceedings and should he desire to appeal that he should contact Mr. Pestarino or myself and he was aware of the fact that we were court-appointed attorneys.

MR. PATTERSON: I have no further questions.

MR. MAYER: Did Mr. Still ever tell you he wanted to appeal?

THE WITNESS: No, he did not.

MR. MAYER: And I take it from that answer he also never told you to file a notice of appeal?

THE WITNESS: No. (p. 42, l. 3–p. 45, l. 15)